Jefferson D. Robinson, Jr., by the Toledo Trust Company, Joseph W. Robinson and Richard D. Logan, Executors of the Estate of Jefferson D. Robinson, Jr., Deceased v. Commissioner.
Robinson v. Commissioner
Docket No. 111214.
United States Tax Court
1943 Tax Ct. Memo LEXIS 215; 2 T.C.M. (CCH) 379; T.C.M. (RIA) 43319; June 30, 1943
*215 H. A. Mihills, C.P.A., 917 Munsey Bldg., Washington, D.C., for the petitioner. W. W. Kerr, Esq., for the respondent. STERNHAGEN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $8,047.75 in income tax for 1939, as a result of the disallowance of deductions of worthless shares and a partially worthless note. Findings of Fact Jefferson D. Robinson, Jr., a resident of Toledo, Ohio, died on April 5, 1942. His income tax return for 1939 was filed in the 10th District of Ohio. On January 3, 1938, the Standard Electric Manufacturing Corporation (called the Mfg. Corp.) was incorporated under the laws of Ohio with an authorized capital of 20,000 shares, consisting of 19,805 shares of no-par common and 195 shares of 5 per cent cumulative $100 preferred, to manufacture and sell electric ranges, water heaters and other devices. The preferred was entitled to $5 cumulative dividends and $100 upon dissodution, before any distribution to common. The consideration for the common was fixed at $25 a share. The Mfg. Corp. was organized to and did acquire the assets and business of The Standard Electric Stove Company (called the Stove Co.) in accordance with the *216 terms of an offer of Dec 1, 1937, by the Stove Co. to Joseph W. Robinson to transfer its assets and business to a new corporation in consideration of the issuance to Stove Co. shareholders of 1,779 1/2 shares of no-par common and 195 shares of 5 per cent cumulative preferred and the assumption of the Stove Co. liabilities as of August 31, 1937, together with such other liabilities incurred in the ordinary course of business after August 31, 1937, and in connection with the consummation of the proposed sale and transfer. The Robinson brothers, decedent and his brother Joseph W., owned no shares in the Stove Co. and in January, 1938, they each bought 2,000 shares in the Mfg. Corp., for which they each paid $50,000 cash. The Mfg. Corp., at the first meeting of the directors, January 3, 1938, accepted the offer and resolved that the aggregate fair value of the assets was at least $168,754.12 and that the liabilities to be assumed were $69,350.44. The $100,000 cash paid in by the Robinson brothers for their shares was used to pay off some of the assumed obligations, to purchase certain machinery and equipment at a cost of $20,177 and to carry on operations. The operations of the Mfg. *217 Corp. were unsuccessful from the beginning and additional funds were necessary. During 1938, the Robinson brothers advanced $140,400 in cash, of which the decedent advanced $65,400, taking a promissory note of the corporation dated December 1, 1938. In 1938, the Mfg. Corp. borrowed $50,000 more from the Guardian Commerce Bank in Cleveland and gave its notes, endorsed by the Robinson brothers. The plant which the Mfg. Corp. acquired from the Stove Co. was located in Toledo, Ohio, in an old three-story brick building with several different floor levels, the inside of the building being entirely of wood construction; it had one old hydraulic elevator; the plant had equipment for fabricating sheet metal but most of it was obsolete; the inventory on hand was obsolete and unbalanced without necessary parts; some of the obsolete parts had been there for 10 or 12 years and were practically worthless but were carried on the books at their original value. The merchandise acquired from the Stove Co. was found to be not salable. The burner, the principal part of an electric range, was not acceptable to principal retailers. Advertising literature had to be discarded. The purchase of a standard *218 burner, instead of continuing the manufacture of its own, increased the cost of the ranges and made it necessary to redesign the entire line. Consequently, the corporation became in dire need of additional working capital. Upon the organization of the corporation, Joseph W. Robinson was elected president and the decedent vice-president. In April, 1938, Joseph W. Robinson became seriously ill and was unable to participate in the management of the business. Request for additional advances was made to the Robinson brothers but at a directors' meeting held on October 17, 1938, the decedent informed the directors that he and his brother did not wish to make further advances and that they desired to withdraw from the operation of the business. Another director, holder of 716 1/2 shares of common, thereupon took over the management. In November or December, 1938, the Robinson brothers gave the corporation a ten-year option to purchase their 4,000 common shares at $1 a share on condition that the corporation first pay the indebtedness to them of $140,400. The Robinson brothers resigned their respective offices, and a committee, consisting of the remaining officers, was formed to carry on *219 the operations. The business was never profitable. The books showed net losses as of October 31, 1938, $190,985.30; as of December 31, 1938, $194,335.35, and as of December 30, 1939, $107,049. The balance sheet as of January 3, 1938, showed assets, including cash on hand and in bank of $108,781.16, accounts and notes receivable, inventories, other assets, permanent assets, patent rights and deferred charges, of a book value of $262,269.43 as against liabilities of $51,389.92, capital stock preferred $19,500 and common $144,487.50, and a surplus of $46,892.01. Its assets and liabilities as shown by its balance sheets for subsequent periods are as follows: Oct. 31, 1938
Dec. 31, 1938
Dec. 30, 1939
Total assets (book value)
$270,133.47
$234,063.12
$132,145.47
Liabilities: Current liabilities, including Robinson notes
$268,347.23
$251,045.72
$259,531.66
Reserve for additional compensation
15,450.00
Reserve for advertising allowances
2,063.05
Capital stock: Preferred
9,200.00
9,200.00
9,200.00
Common
144,487.50
144,487.50
144,487.50
Surplus (Deficit)
(167,351.26)
(170,670.10)
(283,136.74)
$270,133.47
$234,063.12
$132,145.47
After October 18, *220 1938, various steps were taken to reduce expenses and to obtain funds for operation. Advertising and selling expenses were reduced. The number of articles was cut down and standardized for use on any range. Inventories on hand December 31, 1938, were sold as quickly as possible. Equipment was sold in 1939 to obtain operating funds. Prices on obsolete merchandise were cut below cost or book value to dispose of it. A piece of unimproved and unused real estate, carried at a book value of $15,000, was in 1939 placed in the hands of a real estate agent for sale and, although the selling price was reduced to $2,000, could not be sold. By the end of 1939, the remaining inventory was not readily salable. In May, 1939, the Commerce Guardian Bank demanded payment of the two overdue notes of $25,000 each. Later, renewal notes were executed which were endorsed by the Robinson brothers. Early in 1939, some of the corporation's customers refused to deal with it because of its precarious financial condition. By May, 1939, certain suppliers extended only limited credit or demanded payment in advance or upon delivery. Efforts were again made in 1939 by the corporation to persuade the Robinson brothers *221 to provide additional funds for the corporation. Attempts were made to interest outside capital to finance the corporation or to buy the business. Some of the other stockholders were approached. In September, 1939, the Robinson brothers were again approached. September 5, 1939, a report showing the financial condition of the corporation, emphasizing its "desperate situation through lack of working capital" and suggesting plans for refinancing and rehabilitation was submitted to the decedent. Subsequently, in 1939, the Robinson brothers again refused to advance any more money. The officers, having exhausted all means and sources of financial aid known to them, now felt that the situation was hopeless and that bankruptcy or receivership was inevitable. On March 18, 1940, upon the petition of a creditor of the corporation, a receiver was appointed by the Court of Common Pleas of Lucas County, Ohio. The balance sheet of the corporation as of March 18, 1940, showed total assets of $94,812.30, including the land at a $15,000 value. The aggregate liabilities to creditors shown were $242,519.71 and the deficit was $303,369.51. The receiver sold and liquidated all of the assets and property *222 of the corporation and paid two dividends on claims of general creditors, the first of 6 per cent and the second and final dividend of 2 1/4 per cent distributed February 18, 1942. After the filing of his final report on March 11, 1942, and approval thereof by the court, the receiver was discharged. The decedent received 8 1/4 per cent of the face amount of his note of $65,400 and no more from the receiver. The 2,000 shares of common stock of Standard Electric Manufacturing Corporation held by decedent became worthless in 1939 and at least one-half of the $65,400 indebtedness of the corporation to decedent became worthless in 1939. Opinion STERNHAGEN, Judge: The Commissioner in determining the deficiency simply disallowed the deductions in 1939 for the worthless shares and half the worthless debt, without saying why. In his brief, it is said that there was no identifiable event showing worthlessness in 1939 and that the worthlessness was not established until a later year. We think the evidence clearly shows that the shares and the debt were not definitely worthless in 1938 but became worthless before the end of 1939, and this was the only year in which the deductions could properly *223 be taken. The decedent, who knew all the facts, would have been unduly optimistic if he had not recognized by the end of 1939 that there was no responsible ground for hope for the business to succeed and enable him to recover the $50,000 that he had invested in the shares, or that he would recover more than half of the $65,400 that he had loaned the corporation on its note. Indeed, we should suppose that he could not reasonably defend a postponement of either deduction beyond 1939. The disallowance of both the $33,333.33 deduction on account of the worthless shares and the $32,700 deduction on account of the partial worthlessness of the debt is reversed. Other adjustments are not in controversy. Decision will be entered under Rule 50.